# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**JON LARAMORE**
**JANE DALL WILSON**
Faegre Baker Daniels LLP
Indianapolis, Indiana

**MELANIE D. PRICE**
Duke Energy Indiana, Inc.
Plainfield, Indiana

ATTORNEYS FOR APPELLANT
AMICUS CURIAE
INDIANA ENERGY ASSOCIATION:

**ROBERT L. HARTLEY**
**MAGGIE L. SMITH**
Frost Brown Todd LLC

ATTORNEYS FOR APPELLEE
INDIANA OFFICE OF UTILITY
CONSUMER COUNSELOR:

**A. DAVID STIPPLER**
**RANDALL C. HELMEN**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
INDIANA UTILITY REGULATORY
COMMISSION:

**DAVID LEE STEINER**
Deputy Attorney General
Office of the Indiana Attorney General
Indianapolis, Indiana

**BETH KROGEL ROADS**
Assistant General Counsel
Indiana Utility Regulatory Commission
Indianapolis, Indiana

**FILED**
Dec 28 2012, 10:07 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

DUKE ENERGY INDIANA, INC., )
)
    Appellant-Petitioner, )
)
      vs. )    No. 93A02-1111-EX-1042
)
OFFICE OF UTILITY CONSUMER )
COUNSELOR, INDIANA UTILITY )
REGULATORY COMMISSION, )
)
    Appellees-Respondents. )
)

APPEAL FROM THE INDIANA UTILITY REGULATORY COMMISSION
The Honorable James D. Atterholt, Chairman
The Honorable David E. Ziegner
The Honorable Larry S. Landis
The Honorable Carolene R. Mays
The Honorable Kari A. E. Bennett
No. 43743

December 28, 2012

OPINION - FOR PUBLICATION

**VAIDIK, Judge**

## Case Summary

On October 5, 2010, Governor Mitch Daniels fired Indiana Utility Regulatory Commission ("IURC" or "Commission") Chairman David Lott Hardy. Hardy was aware that one of his administrative law judges ("ALJ"), Scott R. Storms, had been communicating with Duke Energy Indiana ("Duke") regarding a position with the company while Storms was presiding over administrative proceedings involving Duke, yet Hardy did not remove Storms from matters involving Duke. This was one such case; Storms was the ALJ, the Indiana Office of Utility Consumer Counselor ("OUCC") recommended denying Duke relief, but the IURC granted Duke's request to utilize deferred-accounting treatment for over $11 million in storm-operating expenses. The IURC conducted an audit but eventually found that Storms did not exert any undue influence in his decision. Nevertheless, the IURC reopened this case for further review and consideration of the evidence presented.

After another evidentiary hearing before a new ALJ and the full Commission at which updated evidence was presented, the IURC, in a lengthy order, denied Duke's

2

request to utilize deferred-accounting treatment for over $11 million in storm-operating expenses. Duke now appeals, arguing that the IURC acted arbitrarily and capriciously when it looked twice at materially the same evidentiary record but came to diametrically opposed decisions without giving any reason for the change.

We, however, find that the IURC's findings are based on substantial evidence that was placed into the record following the IURC's order reopening this proceeding. These findings, in turn, support the IURC's conclusion to deny Duke's request to utilize deferred-accounting treatment for over $11 million in storm-operating expenses. As for Duke's argument that the IURC should have explained why it changed its mind because failing to do so was fundamentally unfair, we find that there were changes in the evidence from the first hearing to the second hearing that justified the IURC's decision to deny Duke relief the second time around, and, in any event, the IURC was not required to explain why it reached a different conclusion. We therefore affirm the IURC's decision to deny Duke's request to utilize deferred-accounting treatment for over $11 million in storm-operating expenses.

## Facts and Procedural History

### A. *Duke Energy Indiana and the Ice Storm*

Duke is a public-utility corporation that supplies electricity to 69 counties and 775,000 customers in Indiana. There was an ice storm in southern Indiana on January 27, 2009, that caused major damage to Duke's electrical system. Approximately 116,000 Duke customers lost power for up to 5 days. Four months before, in September 2008, there was a wind storm in southern Indiana produced by the remnants of Category 4

3

Hurricane Ike that also caused damage to Duke's electrical system. The expenses from both storms totaled $32 million. Duke's retail rates at the time included an annual amount of $2.6 million for storm-damage restoration expenses for major storms.[1] Appellant's App. p. 32.

On July 22, 2009, Duke filed a petition with the IURC, docketed as Cause No. 43743, seeking deferred-accounting treatment for $11.6 million, which represented the retail jurisdictional portion of incremental operating expenses resulting from the January 2009 ice storm.[2] The relief Duke sought would have allowed the ice-storm expenses to be considered for recovery in Duke's next base-rate case. *Id.* at 48-49. According to Duke, this would mean that the "shareholders would absorb the difference between $11.6 million and $32 million." Appellant's Reply Br. p. 9. If deferred-accounting treatment were not granted, Duke would have to recognize such expenses currently as charges to operating income, which would affect Duke's ability to attain the earnings level authorized by the IURC in the last base-rate case due to no controllable measure of its own. Appellant's App. p. 48. The OUCC opposed Duke's petition.

*B. The State Agencies Involved*

---

[1] Duke witness Diana Douglas explained that its current retail rates included:

> an annual amount of 2.6 million for storm damage restoration expenses for major storms. This amount was approved in the May 2004 Order in Cause No. 42359 . . . in the Company's last retail electric general rate case and was based on the actual expenses incurred during the twelve months ended September 30, 2002, test period, as adjusted for changes that were fixed, known and measurable within twelve months.

Tr. p. 235, 455.

[2] The operating expenses Duke sought to recover included operation and maintenance expenses as well as payroll-tax expenses "that would not have been incurred absent the storm." Tr. p. 234.

4

The Indiana General Assembly created the IURC primarily as an impartial fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature. Ind. Code § 8-1-1-5(a); *N. Ind. Public Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1015 (Ind. 2009). The Commission cannot act in the role either of a proponent or opponent on any issue to be decided by it. I.C. § 8-1-1-5(a). The Commission's assignment is to ensure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana. *U.S. Steel*, 907 N.E.2d at 1015.

In contrast, the OUCC is a state agency charged with representing the interests of ratepayers, consumers, and the public in actions before the Commission, the Department of State Revenue, the Indiana Department of Transportation, courts, and federal agencies pursuant to Indiana Code chapter 8-1-1.1. *Lincoln Utils., Inc. v. Office of Util. Consumer Counselor*, 661 N.E.2d 562, 563-64 (Ind. Ct. App. 1996), *reh'g denied*, *trans. denied*; *see also* Ind. Code § 8-1-1.1-4.1.

### C. Storms and the 2010 Order

The IURC held an evidentiary hearing on Duke's petition on November 12, 2009, before ALJ Storms and Commissioner David E. Ziegner. Tr. p. 7. Storms was also the IURC's general counsel. Duke's witnesses were Jim Stanley, President of Duke, who testified about the scope of the damage caused by the wind and ice storms and the costs to repair Duke's power grid; Anthony Geswein, an electric system operations manager who served as the storm manager and testified in detail about the outages caused by the ice storm and Duke's efforts to repair its system; Danny Wiles, an accounting manager who testified about the costs incurred to make repairs caused by the ice storm; and Diana

5

Douglas, a rate manager who testified about storm-repair costs that were covered in Duke's current rates and the deferred-accounting treatment Duke sought for the ice storm. *Id.* at 180-266.

In opposition to Duke's testimony, the OUCC presented the testimony of Greg Foster, a utility analyst in the Electric Division of the OUCC's Energy Group. Foster opposed Duke's request for deferred-accounting treatment for its operating expenses associated with the ice storm because he believed that Duke's proposal constituted single-issue ratemaking and retroactive ratemaking, both of which are generally prohibited. *Id.* at 271. Although there is an exception if a storm is extraordinary, Foster did not believe that the ice storm qualified as an extraordinary storm. *Id.* at 273. All of the testimony was presented in written form; there was no live testimony or cross-examination at the hearing.

Before the hearing, IURC staff issued a staff report[3] that did not make a recommendation either way on whether to grant Duke's request. *Id.* at 296. The staff report did, however, raise concerns about whether Duke provided sufficient evidence that the ice storm was extraordinary. *Id.* at 321. The staff report advised that "if" the Commission were to grant Duke's request, it should do so in relation to the collective storm damages, not just the ice storm. *Id.* at 322. If based on the ice storm alone, the staff report recommended denying Duke's request.

On July 14, 2010, the IURC issued an extensive order approving Duke's request. The order provides, in pertinent part:

[3] "Generally, a staff report is a document issued by technical staff to the Presiding Officers, division staff, and the Commissioners and Chairman. The report usually includes background information, case analysis, recommendations, and staff questions." Tr. p. 286 n.1.

[T]he request in the present proceeding is the product of the overall expenses from the two most damaging storms in a decade occurring within a four-month period. In considering the request in this matter we find the testimony persuasive that the unprecedented magnitude and proximity in time between the two storm events created an extraordinary situation. While the total expense associated with both storm events is more than $32 million, Duke Energy Indiana's request is for approval to defer $11.6 million in retail jurisdictional incremental operating expenses resulting from the Ice Storm. Such an approach recognizes the substantial cost and severity of both storms while attempting to strike a reasonable balance between the utility's shareholders and customers. We find such an approach to be reasonable based on the specific facts presented in this case.

Based on the evidence presented in this matter we find that the facts presented regarding the Ice Storm, in the context of a utility faced with two major events in a four month period at a collective cost of $32 million, rises to the level of extraordinary and justifies an exception to the general prohibition against retroactive and single issue ratemaking. Accordingly, we hereby authorize Duke Energy Indiana to utilize deferred[-]accounting treatment, from the effective date of this Order through the effective date of the Commission's Order in Petitioner's next general retail rate proceeding, for the lesser of the actual amount or $11.6 million in Ice Storm Operating Expenses allocable to the retail jurisdictional customers. . . .

Appellant's App. p. 42 (table omitted). Commission members James D. Atterholt, Larry S. Landis, Carolene Mays, and Ziegner concurred; Hardy was absent. *Id.* at 43.

No party requested reconsideration of the IURC's order. *See* 170 Ind. Admin. Code 1-1.1-22(e) (noting that a party has twenty days to file a petition for rehearing and reconsideration).

The OUCC, however, timely appealed.

### D. The Fallout

In the meantime, at the end of July 2010 Storms learned that he had secured an attorney position at Duke; he started working there two months later on September 27, 2010. Allegations began surfacing that Storms had been negotiating for employment with Duke from April to July 2010, which was when he was also presiding over

7

administrative hearings involving Duke and when the order in this case was issued. On October 5, 2010, Governor Daniels terminated the employment of Hardy, chairman of the IURC, and appointed Atterholt as the Commission's new chair. Press Release, Governor Terminates IURC Chairman, Issues Ethics Memo to Agency Heads (Oct. 5, 2010), http://www.in.gov/activecalendar/EventList.aspx?fromdate=1/1/2010&todate=12/31/201 0&display=Month&type=public&eventidn=38310&view=EventDetails&information_id =76772. Governor Daniels fired Hardy because Hardy was aware that Storms had been communicating with Duke regarding a position with the company when Storms was presiding over administrative proceedings involving Duke, yet Hardy did not remove Storms from matters involving Duke. *Id.*

> On October 14, 2010, the IURC announced that it was
>
> immediately conduct[ing] a legal and technical audit of the cases that former Administrative Law Judge Scott Storms (ALJ Storms) presided over involving Duke Energy Indiana, Inc. The audit will be comprehensive, spanning from January 1, 2010[,] through September 30, 2010. Under the direction of IURC Chairman Jim Atterholt, the Commission is aggressively acting to determine whether any activity by ALJ Storms did not follow normal processes or failed to be supported by evidence or another legal basis. The audit process will consist of reviewing both decisions that were autonomous (such as bench rulings) and group decisions (such as final orders). Documents to be reviewed include, but are not limited to, the following: transcripts, rulings on motions and technical staff reports.

Appellant's Add. p. 5. This audit was "separate from the Inspector General's (IG) investigation." *Id.* The IURC's audit included this case. *Id.* at 12.

In early November 2010, Duke fired Storms as well as Michael Reed, who was President of Duke at that time. John Russell, *Duke fires Indiana president, ex-regulator in fallout from ethics scandal*, Indianapolis Star, Nov. 9, 2010,

8

http://www.indystar.com/article/20101109/BUSINESS/11090334/Duke-Energy-fires-

Indiana-president-and-a-former-regulator?odyssey=tab|topnews|text|IndyStar.com.

*E. Remand and the 2011 Order*

While the OUCC's appeal was still pending in this Court, the OUCC, pursuant to

Indiana Appellate Rule 37, filed a verified motion for stay of appeal and remand. The

OUCC filed this motion because the IURC had not completed its audit:

> It is in the interests of judicial economy and the parties to stay this appeal pending completion of the concurrent audit by the Commission and the investigation by the Inspector General. Moreover, a stay of the appeal is particularly appropriate to enable the Commission to conclude its ongoing review and audit, and a remand to the Commission is therefore warranted to remove any potential challenge to Commission jurisdiction to conduct such audit/review and issue further findings and rulings in the case. The OUCC respectfully submits that the granting of a temporary stay of this appeal and a remand of this matter to the Commission, pending further Order of this Court, is therefore appropriate. *The OUCC has conferred with Appellee Duke Energy Indiana, Inc., who has indicated that Appellee has no opposition to this Motion.*

Appellant's Add. p. 2-3 (emphasis added) (formatting altered).

On November 15, 2010, this Court granted the OUCC's motion for stay of appeal

and remand:

> 1. Appellant's Verified Motion for Stay of Appeal And Remand is GRANTED for further proceedings consistent with this order. This appeal is DISMISSED WITHOUT PREJUDICE to Appellant's right to appeal matters that might arise based upon the proceedings in the Indiana Utility Regulatory Commission on remand, as well as any issues Appellant intended to raise in this appeal. **If Appellant seeks a future appeal, Appellant shall file a new, timely Notice of Appeal to restart the appellate process in this Court.**
> 2. Pursuant to Rule 37(B), this appeal is REMANDED to the Indiana Utility Regulatory Commission, Lower Cause No. 43743.

*Id.* at 21. According to Indiana Appellate Rule 37(B), "Unless the order specifically provides otherwise, *the trial court or Administrative Agency shall obtain unlimited authority on remand*." (Emphasis added). Notably, this Court placed no restrictions on the Commission's authority on remand.

About one month after this Court's order, on December 7, 2010, the IURC released the results of its internal audit conducted pursuant to the October 5, 2010, directive from the Governor's Office that the administrative opinions over which Storms presided be reviewed to ensure no undue influence was exerted in the decisions. Tr. p. 281. The audit found (1) no undue influence was exerted by Storms in his decisions while presiding as ALJ on Duke cases and (2) no anomalies in this case in particular. *Id.* at 295, 296. The audit noted that this was the "sole case in the audit where a party formally appealed the Order." *Id.* at 296. The audit also noted that the IURC's July 14, 2010, Order "was consistent with the technical notes from the staff report. However, the staff report did not advocate for a particular decision on the requested relief, where the Order granted the requested relief." *Id.* Finally, the audit noted that the transcript and docket entries showed "rulings consistent with normal legal Commission practice." *Id.*

But in a separate order also dated December 7, 2010, the IURC, on its own, concluded that this case should nevertheless be reopened. Appellant's App. p. 145. Again, the IURC noted that this case "was the only proceeding during 2010 in which an appeal to the Court of Appeals was pursued by one of the parties." *Id.* The IURC explained that while "the audit did not find the [July 14, 2010,] Order directly conflicted with the staff report, it did note that the staff report offered no specific recommendation

10

to either approve or deny [Duke's] requested relief." *Id.* The IURC therefore *"reopen[ed] this Cause for further review and consideration of the evidence presented."* *Id.* (emphasis added).

Duke did not object to or otherwise challenge this order. Instead, an attorneys' conference was held on March 7, 2011, and by agreement of the parties a schedule was set to provide for the filing of additional pre-filed testimony and an evidentiary hearing. *Id.* at 5-6. Again, Duke did not object. The evidentiary hearing was held on June 9, 2011, before a new ALJ, Gregory Ellis, and the full Commission: Chairman Atterholt and Commissioners Kari A.E. Bennett, Landis, Mays, and Ziegner. Although there was no live testimony or cross-examination at the first hearing, at this hearing there was live testimony, cross-examination, and questions from the Commissioners. All evidence and exhibits were admitted into the record without objection. Duke presented the testimony of Stanley, Wiles, and Douglas. In the place of Geswein, who had retired, Duke presented the testimony of Brian Liggett. The OUCC again presented the testimony of Foster. Although the evidence presented was similar, it was not exactly the same.

Duke revised its testimony to increase the amount of storm costs it sought to defer from $11.6 million to $11.9 million. Stanley, who was president of Duke Energy Indiana when the petition was filed but was currently a top executive at Duke Energy in North Carolina, clarified that Duke was not seeking recovery of any restoration costs associated with the wind storm, just the ice storm, but that it was a combination of both storms that made it extraordinary, thus falling within an exception to the general prohibition against single-issue and retroactive ratemaking. Stanley further explained that Duke was not

11

claiming financial hardship from the storm but rather, "We're simply asking the Commission to consider our request for fairness between customers and shareholders." Tr. p. 38. The OUCC admitted into evidence the IURC's December 7, 2010, audit. *Id.* at 20-21, 281. OUCC witness Foster then talked about the events since the IURC's July 2010 order that granted Duke's requested relief. Foster specifically referred to the IURC's audit. Foster emphasized that the IURC's July 2010 order was premised on the combination of both storms yet Duke only sought relief from the ice storm, which, notably, was classified as a less severe storm and was a less expensive storm than the wind storm. Foster testified that "it's our understanding in our office that storms should be evaluated on an individual basis" and should not be combined as Duke argued to determine whether a storm is extraordinary. *Id.* at 163. Foster believed that the ice storm did not rise to the level of an extraordinary storm and again recommended that the IURC deny Duke's request.

On October 19, 2011, the IURC issued an extensive "Order on Reconsideration" denying Duke's request. The order provides, in pertinent part:

> On the re-opening of this case, no evidence was offered concerning any allegations of undue influence associated with this proceeding. *Nonetheless, the parties resubmitted updated evidence and therefore, our obligation as an impartial fact-finding body requires that we re-examine this case on its merits.*
>
> * * * * *
>
> The testimony presented in this matter demonstrates the Ice Storm, by itself, was not the worst storm damage ever encountered by the Company. In addition, although the Wind Storm and Ice Storm occurred within a relatively close period of time, the evidence also indicates that Duke Energy Indiana experiences approximately three Level 3 storms each year and one Level 4 storm every three to four years.
>
> * * * * *

12

Petitioner's evidence fails to put the losses into the larger context of the overall impact on Petitioner's financial condition. We are therefore left with a dearth of evidence as to the actual impact of an $11.9 million loss, and whether and under what circumstances does a loss of that magnitude become extraordinary. What may be extraordinary for a jurisdictional municipal utility or rural electric membership corporation may be a relatively modest financial event for a large investor owned utility. We believe there is a danger in falling victim to the "tyranny of large numbers" when we lack sufficient context in which to view them.

[T]he amount embedded in base rates to meet storm damage obligations carries with it a risk of under or over recovery that is shared by both the shareholders and the ratepayers. In addition, while we recognize that Petitioner engaged in exemplary measures to restore customers' power, including drawing upon crews from its regulated utility affiliates as well as from mutual assistance group members, it is no less than we would expect from a utility in fulfilling its obligation to provide reasonable and adequate service even in difficult circumstances. Consequently, notwithstanding the fact that Duke Energy Indiana's request for approval to defer $11.9 million in retail jurisdictional incremental operating expenses resulting from the Ice Storm attempts to strike a reasonable balance between the utility's shareholders and customers, it is the obligation of the Commission in considering such requests, to strike a balance between the utility and its ratepayers. The Company also seemingly recognizes that the regulatory compact sometimes entails risks that will inure to shareholders rather than ratepayers. This is one such instance. For the reasons set forth above, we find that the balance weighs in favor of the ratepayers, as the Ice Storm at issue in this proceeding was not an extraordinary storm that warrants an exception to the prohibition against retroactive and single issue ratemaking.

Appellant's App. p. 18, 21, 23 (emphasis added) (footnote omitted). Chairman Atterholt and Commissioners Landis and Mays concurred. *Id.* at 24. Commissioners Bennett and Ziegner dissented with opinion. *Id.* at 25-26. Bennett and Ziegner disagreed with the decision to reopen and reweigh the evidence; they reasoned that the audit did not find any anomalies and that the evidence was not materially different from the originally presented evidence. *Id.* at 25.

Duke appealed, with the Indiana Energy Association appearing as Amicus Curiae. Both the IURC and the OUCC filed separate appellee's briefs.

13

We held oral argument on December 10, 2012. At oral argument, Duke conceded that it had waived some of the issues that it had raised in its initial Appellant's Brief because it did not argue those issues below, specifically, that the IURC's review was limited to evidence of undue influence and that the IURC could only reconsider the case based on new evidence. Oral Arg. Video Tr. at 2:20-3:02. Duke, however, maintained that it had not waived the argument that the IURC acted arbitrarily and capriciously when it looked twice at materially the same evidentiary record but came to diametrically opposed decisions without giving any reason for the change. *Id.* at 3:09-3:57.

## Discussion and Decision

Duke contends that the IURC acted arbitrarily and capriciously when it looked twice at materially the same evidentiary record but came to different decisions without giving any reason for the change. Duke claims that such an outcome "undermines public confidence in the legal process and erodes the basis for judicial deference to the agency's expertise or judgment."[4] Appellant's Br. p. 23. Duke therefore asks us to vacate the IURC's October 2011 order and reinstate its July 2010 order subject to the OUCC's original appeal.

---

[4] The amicus expands on this in its brief, noting that Moody's Investor Service

has already issued a public[ly]-distributed credit opinion for Duke Energy that expressly mentions the Commission's changed position in support of the conclusion that the "[c]redit supportive regulatory framework in Indiana could be negatively impacted by [Duke Energy's] Edwardsport issues." Moody's Investor Service, *Credit Opinion: Duke Energy Indiana, Inc.*, pp. 2-3 (January 12, 2012) ("In October, for example, the IURC reversed an order that allowed the company to defer recovery of approximately $12 million of costs related to a 2009 ice storm . . . .").

Amicus Br. p. 12 (footnotes omitted).

14

Indiana Code section 8-1-3-1 authorizes judicial review of IURC decisions as follows:

> Any person, firm, association, corporation, limited liability company, city, town, or public utility adversely affected by any final decision, ruling, or order of the commission may, within thirty (30) days from the date of entry of such decision, ruling, or order, appeal to the court of appeals of Indiana for errors of law under the same terms and conditions as govern appeals in ordinary civil actions, except as otherwise provided in this chapter and with the right in the losing party or parties in the court of appeals to apply to the supreme court for a petition to transfer the cause to said supreme court as in other cases. An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

This section includes language identical to provisions for judicial review of other administrative agency actions. *U.S. Steel*, 907 N.E.2d at 1015 & n.1.

As our Supreme Court has explained, "[t]his amounts to multiple tiered review." *Id.* at 1016. On the first level, it requires a review of whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. *Id.* Such determinations of basic fact are reviewed under a substantial-evidence standard, meaning the order will stand unless no substantial evidence supports it. *Id.* In substantial-evidence review, "the appellate court neither reweighs the evidence nor assesses the credibility of witnesses and considers only the evidence most favorable to the Board's findings." *Id.* (quotation omitted). The Commission's order is conclusive and binding unless (1) the evidence on which the Commission based its findings was devoid of probative value; (2) the quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis; (3)

15

the result of the hearing before the Commission was substantially influenced by improper considerations; (4) there was not substantial evidence supporting the findings of the Commission; or (5) the order of the Commission is fraudulent, unreasonable, or arbitrary. *Id.* This list of exceptions is not exclusive. *Id.*

At the second level, the order must contain specific findings on all the factual determinations material to its ultimate conclusions. *Id.* This judicial task involves reviewing conclusions of ultimate facts for reasonableness, the deference of which is based on the amount of expertise exercised by the agency. *Id.* Insofar as the order involves a subject within the Commission's special competence, courts should give it greater deference. *Id.* If the subject is outside the Commission's expertise, courts give it less deference. *Id.* In either case, courts may examine the logic of inferences drawn and any rule of law that may drive the result. *Id.* Additionally, an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order. *Id.*

Given Duke's concession that it has waived any argument that the IURC was limited to addressing certain issues after it reopened the case and held the second hearing, we first treat the second hearing as an independent hearing before the IURC and therefore look at the IURC's October 2011 order by itself. This means that the IURC's October 2011 order will only be considered arbitrary and capricious if the IURC failed to make findings of fact in support of the conclusion that it reached in its October 2011 order. We therefore review whether there is substantial evidence to support the IURC's findings and

16

whether its order contains specific findings on all the factual determinations material to its ultimate conclusions. Because interpreting the IURC's October 2011 order is a question falling well within its expertise, a high level of deference is owed to the IURC. *See id.* at 1018.

In its twenty-page, single-spaced October 2011 order, the IURC found, in mixed findings and conclusions, as follows:

- Duke's framing of the argument regarding its request to aggregate storm events for the purpose of determining what constitutes an extraordinary storm added complexity and uncertainty and raised a myriad of additional issues regarding aggregating such evidence, such as how many events can be aggregated and how close in time the events must occur. Appellant's App. p. 21.

- Risks that cannot be adequately predicted are considered in establishing a utility's return on equity, and the fact that storm damage exceeded its base-rate revenue requirement does not address whether the utility had other offsetting operating-expense decreases. *Id.*

- The testimony supported a determination that the ice-storm costs were fixed, known, and measurable, but Duke's argument with respect to current earnings was not persuasive. *Id.* at 22.

- Duke's examination of its earnings in the context of fuel adjustment cost (FAC) proceedings alone did not support the relief requested. *Id.* at 23.

- Duke's evidence failed to put the storm damage costs into the larger context of the overall impact of such costs on Duke's financial condition, leaving the Commission "with a dearth of evidence as to the actual impact of an $11.9 million loss, and whether and under what circumstances does a loss of that magnitude become extraordinary." *Id.*

- In striking a balance between the utility and its ratepayers, the balance weighed in favor of the ratepayers, as the ice storm was not an extraordinary storm that warranted an exception to the prohibition against retroactive and single-issue ratemaking. *Id.*

17

- Duke's request for deferred-accounting treatment did not merit an exception to the general prohibition against retroactive and single-issue ratemaking. *Id.* at 24.

- The issues raised were more appropriately addressed in a rate case, in which the severity of a storm and the corresponding overall financial impact on the utility between rate cases could be considered. *Id.* at 23-24.

Each of these findings is based on substantial evidence that was placed into the record following the IURC's December 7, 2010, order reopening this proceeding. These findings, in turn, support the IURC's conclusion to deny Duke's request to utilize deferred-accounting treatment for $11.9 million in storm-operating expenses.

Nevertheless, Duke argues that the IURC should have explained why it changed its mind because failing to do so was fundamentally unfair. *See generally* Appellant's Reply Br. p. 2-3. We, however, find that there were changes in the evidence from the first hearing to the second hearing that justified the IURC's decision to deny Duke relief in its October 2011 order.

At the second hearing, Stanley testified that Duke was not seeking recovery of any restoration costs associated with the wind storm, just the ice storm, but that it was a combination of both storms that made it extraordinary. On cross-examination, Stanley explained that Duke was not claiming financial hardship from the storm but rather, "We're simply asking the Commission to consider our request for fairness between customers and shareholders." Tr. p. 38. This request by the former Duke Energy Indiana President ignores the fact that the amount embedded in Duke's base rates to meet annual storm-damage expenses included the risk of under or over recovery that was already being shared by shareholders and ratepayers.

18

In addition, Duke asked for an additional $300,000 during the second hearing.

Finally, OUCC witness Foster pre-filed new testimony, which included new information. The IURC's audit was admitted into the record, and IURC staff comments became a part of the record for the first time. The staff comments said that if relief was based on the ice storm alone, then Duke's request should be denied.

We find that these differences in the evidence between the two hearings justified the IURC's decision to deny Duke relief in the October 2011 order.

Regardless, we find that the IURC did not have to explain why it reached a different conclusion in its October 2011 order. Duke has conceded that it waived any argument that there were limitations placed on the IURC during the second hearing because it failed to object below. Moreover, Duke is unable to cite to any authority requiring the IURC to fully explain why it changed its mind following a new hearing on the issues at which updated evidence was presented. Duke cites *Indiana State Board of Registration and Education for Health Facility Administrators v. Cummings*, 180 Ind. App. 164, 387 N.E.2d 491 (1979), *reh'g denied*, for the proposition that due process and rule of law require an explanation when an agency executes an "about-face." Appellant's Reply Br. p. 9. But *Cummings* simply stands for the proposition that an agency decision is arbitrary and capricious if it is not supported by adequate written reasons. As explained above, the IURC's October 2011 order is supported by adequate written reasons. Instead, we find that what happened here is analogous to what sometimes happens in civil cases across this state. That is, it is similar to a trial court denying a party's summary-judgment motion without explanation early in a case but then granting

19

that very same summary-judgment motion, on the same evidence, one week before trial without explanation. In both instances, the evidence is essentially the same, and the "judge" is not required to give an explanation as to why he changed his mind between one decision and another.

Although the better practice would have been for the IURC to clearly articulate why it reached different conclusions, we find that the updated evidence presented at the second hearing justified the IURC's decision to deny Duke relief in its October 2011 order, and, in any event, the IURC was not required to explain why it reached an opposite conclusion in its October 2011 order. We therefore affirm the IURC's October 2011 order denying Duke's request to utilize deferred-accounting treatment for $11.9 million in storm-operating expenses.

Affirmed.

MATHIAS, J., and BARNES, J., concur.