**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 19 2014, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**J. DAVID AGNEW**
Lorch Naville Ward, LLC
New Albany, Indiana

**MICHAEL A. MULLETT**
Mullett & Associates
Columbus, Indiana

**JENNIFER A. WASHBURN**
Citizens Action Coalition of Indiana, INC.
Indianapolis, Indiana

**JEROME POLK**
Polk & Associates, LLC
Davie, Florida

ATTORNEYS FOR APPELLEE:
DUKE ENERGY INDIANA, INC.:

**JON LARAMORE**
**JANE DALL WILSON**
Faegre Baker Daniels LLP
Indianapolis, Indiana

**KELLEY A. KARN**
**ELIZABETH HERRIMAN**
Duke Energy Indiana, INC.
Plainfield, Indiana

ATTORNEYS FOR APPELLEE:
INDIANA OFFICE OF UTILITY
CONSUMER COUNSELOR:

**A. DAVID STIPPLER**
**LORRAINE HITZ-BRADLEY**
**RANDALL C. HELMEN**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:
DUKE ENERGY INDIANA
INDUSTRIAL GROUP:

**TODD A. RICHARDSON**
**TIMOTHY L. STEWART**
**JOSEPH P. ROMPALA**
**TABITHA L. BALZER**
Lewis & Kappes, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:
INDIANA UTILITY REGULATORY
COMMISSION:
**DAVID LEE STEINER**
Deputy Attorney General
Indianapolis, Indiana

**BETH KROGEL ROADS**
Assistant General Counsel
Indiana Utility Regulatory Commission
Indianapolis, Indiana

BRIEF OF AMICI CURIAE:
ACLU OF INDIANA, COMMON
CAUSE INDIANA, HOOSIERS
FIRST, LEAGUE OF WOMEN
VOTERS OF INDIANA, SAVE
MAUMEE GRASSROOTS
ORGANIZATION, INC., AND
UNITED SENIOR ACTION, INC. IN
SUPPORT OF APPELLANTS:

**GAVIN M. ROSE**
ACLU of Indiana
Indianapolis, Indiana

BRIEF OF PROPOSED AMICI
CURIAE IN SUPPORT OF
APPELLANTS:

**ROSEMARY G. SPALDING**
Spalding & Hilmes, PC
Indianapolis, Indiana

**BRIDGET M. LEE**
Earthjustice
New York, New York

2

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CITIZENS ACTION COALITION OF INDIANA, INC., SAVE THE VALLEY, INC., SIERRA CLUB, AND VALLEY WATCH, INC., Appellants-Respondents, | ) ) ) ) ) | |
| vs. | ) ) | No. 93A02-1301-EX-76 |
| DUKE ENERGY INDIANA, INC., Appellee-Petitioner, | ) ) ) | |
| INDIANA OFFICE OF UTILITY CONSUMER COUNSELOR, STEEL DYNAMICS, INC., NUCOR STEEL—INDIANA, CHRYSLER GROUP, LLC, USG CORPORATION, Appellees-Respondents | ) ) ) ) ) ) | |
| DUKE ENERGY INDIANA INDUSTRIAL GROUP, Appellee-Intervenor | ) ) ) ) | |
| INDIANA UTILITY REGULATORY COMMISSION, Appellee. | ) ) ) | |

APPEAL FROM THE INDIANA UTILITY REGULATORY COMMISSION
James D. Atterholt, Chairman
Kari A.E. Bennett, Commissioner
Larry S. Landis, Commissioner
Carolene Mays, Commissioner
David E. Ziegner, Commissioner
David E. Veleta, Administrative Law Judge
Cause No. 43114-IGCC-4
Cause No. 43114-IGCC-4S1
Cause No. 43114-IGCC-5
Cause No. 43114-IGCC-6
Cause No. 43114-IGCC-7
Cause No. 43114-IGCC-8

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

Citizens Action Coalition of Indiana, Inc., Save the Valley, Inc., Sierra Club, Inc., and Valley Watch, Inc. (collectively, "Interveners") appeal orders of the Indiana Utility Regulatory Commission ("the Commission") related to power plant construction costs incurred by Duke Energy Indiana, Inc. ("Duke") and a settlement agreement executed by Duke, the Duke Energy Indiana Industrial Group,[1] Nucor Steel, and the Office of the Utility Consumer Counselor (the "OUCC")[2] (collectively, "Settling Parties"), adopted as modified by the Commission ("the Modified Settlement Agreement"). One appealed order approves the settlement, as modified, and four others implement it. We affirm.

## Issue

Interveners seek to have the Modified Settlement Agreement vacated. They claim that the Commission acted contrary to law[3] by approving the Modified Settlement Agreement upon finding it to be reasonable and in the public interest, although:

---

[1] This entity is comprised of multiple Duke Energy Indiana consumers.

[2] The OUCC is a state agency charged with representing the interests of ratepayers, consumers, and the public in actions before the Commission, the Department of State Revenue, the Indiana Department of Transportation, courts, and federal agencies pursuant to Indiana Code chapter 8-1-1.1.

[3] To a significant degree, the nattering of issues fails to include language adhering to the tightly circumscribed parameters for appellate review of an agency decision. Interveners suggest that we may reverse the

4

The Commission did not contemporaneously order Duke to reduce carbon emissions from the power plant;

The Commission denied a request for a subdocket to address allegations of ethical impropriety occurring in a pre-settlement phase of the proceedings;

Interveners were denied periodic reports from an engineering consultant overseeing construction of the power plant;

The Commission denied Interveners' motions to dismiss the settlement on grounds of insufficiency of the evidence as to the reasonableness of attorney's fees payable by Duke shareholders; and

Interveners had asserted that a more precise division of costs between ratepayers and Duke shareholders could be achieved, relieving ratepayers of liability for imprudently incurred construction costs[4] and requiring Duke to account for collection of deferred taxes from ratepayers in calculating an allowance for funds used during construction ("AFUDC").

## Facts and Procedural History

On November 20, 2007, the Commission issued Certificates of Public Convenience and Necessity ("CPCN"), approving the cost estimate of $1.985 billion to build an integrated coal gasification combined cycle generating facility in Edwardsport, Indiana ("the IGCC Project"). The construction and operating costs were recoverable from ratepayers. The relevant facts regarding the issuance of the CPCNs were summarized in Citizens Action Coalition v. PSI Energy, 894 N.E.2d 1055, 1059-60 (Ind. Ct. App. 2008), reh'g denied:

On September 7, 2006, Duke and Southern Indiana Gas and Electric Company, d/b/a Vectren Energy Delivery of Indiana, Inc. ("Vectren") filed a petition with the Commission seeking approval to build an integrated gasification combined cycle ("IGCC") electric power plant at Duke's Edwardsport facility in Knox

---

Commission's order approving settlement if Interveners establish any irregularity in the proceedings. We consolidate and restate Interveners' issues in accordance with Indiana Code section 8-1-3-1.

[4] According to Indiana Code section 8-1-8.5-6.5, actual construction costs may be disallowed upon finding of fraud, concealment, or gross mismanagement. Subsection (2) provides that recovery of costs from the ratepayers above a pre-approved level can occur only if the costs were prudent.

County, Indiana. Duke operated a coal and oil-fired generating station at the Edwardsport facility that had a total of 160 megawatt capacity, was placed in service between 1944 and 1951, and was nearing the end of its useful economic life. The proposed IGCC facility would have a 630 megawatt capacity. An IGCC generating facility converts coal into synthesis gas, which is used to fuel highly efficient combustion turbines. The IGCC technology is a cleaner and more efficient way of producing electricity than conventional coal-fired plants.

Before constructing an electric generating facility in Indiana, public utilities must obtain a Certificate of Public Convenience and Necessity under Ind. Code §§ 8-1-8.5. Additionally, under Ind. Code §§ 8-1-8.7, a public utility may not use clean coal technology, such as IGCC, at a new or existing facility without obtaining a Certificate of Public Convenience and Necessity.

Duke's petition also sought, in part, to obtain certain financial incentives authorized under Ind. Code §§ 8-8-8.8 for a clean coal and energy project,[5] such as "[t]he timely recovery of costs incurred during construction and operation" of the project. Ind. Code § 8-1-8.8-11(a)(1).

---

[5] Ind. Code § 8-1-8.8-2 defines "clean coal and energy projects" as any of the following:
    (1) Any of the following projects:

        (A)    Projects at new energy production or generating facilities that employ the use of clean coal technology and that produce energy, including substitute natural gas, primarily from coal or gases, derived from coal from the geological formation known as the Illinois Basin.

        (B)    Projects to provide advanced technologies that reduce regulated air emissions from existing energy production or generating plants that are fueled primarily by coal or gases from coal from the geological formation known as the Illinois Basin, such as flue gas desulfurization and selective catalytic reduction equipment.

        (C)    Projects to provide electric transmission facilities to serve a new energy production or generating facility.

        (D)    Projects that produce substitute natural gas from Indiana coal by construction and operation of a coal gasification facility.

    (2) Projects to develop alternative energy sources, including renewable energy projects and coal gasification facilities.

    (3) The purchase of fuels produced by a coal gasification facility.

    (4) Projects described in subdivisions (1) through (3) that use coal bed methane.

Pursuant to statute, the Indiana Office of Utility Consumer Counselor participated in the proceedings before the Commission. See Ind. Code §§ 8-1-1.1. Additionally, the Indiana Industrial Group, Nucor Steel, the Citizens Action Coalition of Indiana, Inc., Save the Valley, Inc., Valley Watch, Inc., the Sierra Club, the Indiana Wildlife Federation, the Clean Air Task Force, and the Indiana Coal Council intervened in the action.

Extensive amounts of evidence were presented to the Commission, and an evidentiary hearing was held in June 2007. . . . On November 20, 2007, the Commission issued a sixty-three page order granting Duke's petition for Certificates of Public Convenience and Necessity for the Edwardsport IGCC facility. The Commission also ordered that Duke was entitled to "timely recovery of its construction, operating and maintenance costs incurred in connection with the IGCC Project…" [Appellant's Appendix] at 82.

This Court affirmed the Commission's CPCN Order approving the cost estimate of $1.985 billion. Id. at 1070.

On June 3, 2008, the Commission issued an order providing that its review of the IGCC Project would be conducted first by the introduction and consideration of evidence presented in semi-annual IGCC Rider proceedings[6] and second, through independent engineering oversight of the Project. The Commission ordered Duke to retain the services of Black & Veatch Corporation ("Black & Veatch") "[i]n order to facilitate the Commission's continuing oversight of the Edwardsport Project that falls outside the parameters [of the] IGCC Rider proceedings." IURC App. 2.

On January 7, 2009, the Commission issued an order in IURC Cause No. 43114IGCC-1 ("IGCC-1") approving an increase in the cost estimate from $1.985 billion to $2.35 billion.[7]

---

[6] Indiana Code section 8-1-8.8-11 allows timely recovery of costs, for which "Rider" proceedings are used.

[7] This order was not appealed. The $2.35 billion cost estimate included $2.225 billion in estimated construction costs and $125 million in estimated Allowance for Funds Used During Construction ("AFUDC"). AFUDC are financing costs that the utility accrues during construction or until the construction and financing

7

On November 3, 2008, Duke filed a semi-annual IGCC Rider proceeding for cost recovery, IURC Cause No. 43114IGCC-2 ("IGCC-2"). On May 13, 2009, the Commission approved the petition. On May 1, 2009, Duke filed its petition in IURC Cause No. 43114IGCC-3 ("IGCC-3"); this was approved on December 2, 2009.

On November 24, 2009, Duke filed a petition that included its semi-annual IGCC rider proceeding for cost recovery, IURC Cause No. 43114IGCC-4 ("IGCC-4"), and, in a subdocket proceeding, a request to review a revised cost estimate for the IGCC Project, IURC Cause No. 43114IGCC-4S1 ("IGCC-4S1"). The subdocket was bifurcated: Phase I was to address Duke's IGCC-4 progress report, the increased cost estimate for the IGCC Project, and the continued need and reasonableness of going forward with the IGCC Project; and Phase II was to address allegations of fraud, concealment, and gross mismanagement with regard to the IGCC Project.

On September 17, 2010, the Settling Parties (excluding Nucor Steel) submitted a settlement agreement to the Commission in IGCC-4S1. The settlement agreement set a hard cap of $2.975 billion on the construction costs of the IGCC Project. Subsequently, amidst an ethics scandal, the settlement agreement was withdrawn.

After the Commission conducted and concluded extensive evidentiary hearings, the Settling Parties (then expanded to include Nucor Steel) filed a petition to reopen the record and submit a second settlement agreement. Additional testimony was presented at a four-day

costs are included in rates either through the IGCC Rider or through a rate case.

8

settlement hearing. On December 27, 2012, the Commission approved the settlement with some modification.

The Modified Settlement Agreement included a $2.595 billion hard cap for construction costs (to be included in rates over a thirty-year period), $380 million less than that of the first settlement agreement. The total was inclusive of $2.319 billion of "direct costs" and approximately $276 million "in AFUDC as of June 30, 2012." (Tr. 34,228.) After June 30, 2012, AFUDC would "grow at approximately 9 to 10 million per month … until [construction while in progress financing charges] are put into effect." (Tr. 34,228.) Additional terms include:

> Duke may not recover construction costs from ratepayers above the hard cost cap, unless a force majeure situation occurs;
>
> The construction costs up to the hard cap are deemed reasonable and necessary;
>
> The construction costs would not be reduced below the hard cap because of issues related to imprudence, fraud, concealment, or gross mismanagement, or concerning ex parte communications, improper conduct, undue influence, appearances of impropriety, or related issues;
>
> Duke agreed not to file a retail electric rate case prior to March of 2013, with no increase to the base rates implemented prior to April 1, 2014;
>
> Duke's depreciation rates[8] for non-IGCC plant and equipment were to be updated to result in savings to retail customers of $35 million annually;
>
> Duke was to prospectively include deferred taxes in the capital structure used in its IGCC Rider;[9]

---

[8] Wes Blakley of the OUCC testified that depreciation expenses are often referred to as "return of" investment. (Tr. 35,222.) New depreciation rates are "normally" instituted only at the time of a rate case. (Tr. 5,223.)

[9] This represents a return to "traditional ratemaking." (Tr. 34,695.) As summarized by Duke's accountant, Danny Wiles: "Standard ratemaking practice in Indiana is for deferred tax liabilities to be included as a zero-

9

Ratepayers were to receive 100% of the retail jurisdictional share of any IGCC Project-specific funding received as incentive tax credits and property tax credits; and

Duke was to pay from shareholder funds: $13.5 million to Settling Parties for attorney's fees and litigation expenses, $2 million to the Indiana Utility Ratepayer Trust, $3.5 million to the Indiana Low Income Home Energy Assistance Program, and $1 million to establish a fund to develop a clean energy initiative.

(App. 246 – 251.)

With Duke having continued to make semi-annual IGCC Rider filings pending the settlement, the Commission determined that IURC Cause No. 43114IGCC-5 ("IGCC-5") and IURC Cause No. 43114IGCC-6 ("IGCC-6") would be considered as part of the Commission's review under the subdocket proceedings in IGCC-4S1. Duke subsequently filed semi-annual IGCC Rider filings in IURC Cause Nos. 43114IGCC-7 ("IGCC-7") and 43114IGCC-8 ("IGCC-8"). On the same day it issued its Final Order in the IGCC-4S1 subdocket, the Commission issued orders in IGCC-5, IGCC-6, IGCC-7, and IGCC-8, implementing the Modified Settlement Agreement approved in the Final Order in IGCC-4S1.

The Edwardsport plant began commercial operations in 2013. Ultimately, the approved cost was $2.88 billion.

---

cost component of the capital structure, which mathematically reduces the equity percentage of the capital structure when compared to a scenario where deferred income taxes are not included in the capital structure calculations. However, deferred income tax balances are not included as components of rate base in Indiana. For the IGCC rider, we were granted an incentive to exclude the Duke Energy Indiana deferred tax liabilities when calculating the rate of return allowed in the rider. The effect was to increase the amount collected via the rider, including the equity return component, from what it would have been under Indiana's customary rate calculations. As part of the IGCC settlement, we have agreed to forego the deferred tax incentive from future increases to the IGCC rider." (Tr. 34,571.)

The Interveners filed Notices of Appeal to challenge orders in IGCC-4, IGCC-4S1, IGCC-5, IGCC-6, IGCC-7, and IGCC-8. Duke's petition to consolidate the appeals was granted.

**Discussion and Decision**

Standard of Review

The Commission was created by the Indiana General Assembly to act "primarily as a fact-finding body with the technical expertise to administer the regulatory scheme devised by the legislature." Northern Ind. Public Serv. v. U.S. Steel, 907 N.E.2d 1012, 1015 (Ind. 2009). The Commission was assigned the responsibility "to insure that public utilities provide constant, reliable, and efficient service to the citizens of Indiana." Id.

Indiana Code section 8-1-3-1 provides for judicial review of the Commission's decisions in language almost identical to provisions for judicial review of other administrative agency actions:

> Any person, firm, association, corporation, limited liability company, city, town, or public utility adversely affected by any final decision, ruling, or order of the commission may, within thirty (30) days from the date of entry of such decision, ruling, or order, appeal to the court of appeals of Indiana for errors of law under the same terms and conditions as govern appeals in ordinary civil actions, except as otherwise provided in this chapter and with the right in the losing party or parties in the court of appeals to apply to the supreme court for a petition to transfer the cause to said supreme court as in other cases. An assignment of errors that the decision, ruling, or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling, or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

Our review is two-tiered:

On the first level, it requires a review of whether there is substantial evidence in light of the whole record to support the Commission's findings of basic fact. Citizens Action Coalition of Ind., Inc. v. N. Ind. Pub. Serv. Co., 485 N.E.2d 610, 612 (Ind. 1985). Such determinations of basic fact are reviewed under a substantial evidence standard, meaning the order will stand unless no substantial evidence supports it. McClain [v. Review Bd. of Ind. Dept. of Workforce Dev., 693 N.E.2d 1314, 1317-18 (Ind. 1998)]. In substantial evidence review, "the appellate court neither reweighs the evidence nor assesses the credibility of witnesses and considers only the evidence most favorable to the Board's findings." Id. The Commission's order is conclusive and binding unless (1) the evidence on which the Commission based its findings was devoid of probative value; (2) the quantum of legitimate evidence was so proportionately meager as to lead to the conviction that the finding does not rest upon a rational basis; (3) the result of the hearing before the Commission was substantially influenced by improper considerations; (4) there was not substantial evidence supporting the findings of the Commission; (5) the order of the Commission is fraudulent, unreasonable, or arbitrary. Id. at 1317 n. 2. This list of exceptions is not exclusive. Id.

At the second level, the order must contain specific findings on all the factual determinations material to its ultimate conclusions. Citizens Action Coalition, 485 N.E.2d at 612. McClain described the judicial task on this score as reviewing conclusions of ultimate facts for reasonableness, the deference of which is based on the amount of expertise exercised by the agency. McClain, 693 N.E.2d at 1317-18. Insofar as the order involves a subject within the Commission's special competence, courts should give it greater deference. Id. At 1318. If the subject is outside the Commission's expertise, courts give it less deference. Id. In either case courts may examine the logic of inferences drawn and any rule of law that may drive the result. Id. Additionally, an agency action is always subject to review as contrary to law, but this constitutionally preserved review is limited to whether the Commission stayed within its jurisdiction and conformed to the statutory standard and legal principles involved in producing its decision, ruling, or order. Citizens Action Coalition, 485 N.E.2d at 612-13.

Northern Ind. Public Serv., 907 N.E.2d at 1016.

Indiana law strongly favors settlement as a means of resolving contested proceedings.

See e.g., Manns v. State Dep't of Highways, 541 N.E.2d 929, 932 (Ind. 1989). However, the

Commission "may not accept a settlement merely because the private parties are satisfied;

rather [the Commission] must consider whether the public interest will be served by accepting the settlement." Citizens Action Coal. v. PSI Energy, 664 N.E.2d 401, 406 (Ind. Ct. App. 1996).

A regulatory settlement becomes effective when the Commission acts upon the agreement. Northern Ind. Public Serv., 907 N.E.2d at 1017. An agreement between private parties takes on public interest ramifications once the Commission has approved the agreement. Id. "It is undisputed that the policies favoring settlement agreements are 'further enhanced' when one of the parties proposing the settlement is the OUCC." Nextel West Corp. v. Indiana Utility Reg. Comm'n., 831 N.E.2d 134, 156 (Ind. Ct. App. 2005), trans. denied. "Consumers that do not retain counsel to go before the Commission essentially have two levels of protection: the Commission's 'watchdog role' as an administrative agency and the OUCC's statutory role as a consumer representative in actions before the Commission." Id. at 155.

Here, the Commission approved a settlement agreement, with modifications, effectively making the Modified Settlement Agreement an order of the Commission. Approval of the settlement that allocated costs between utility investors and ratepayers required the Commission to exercise its particular expertise. As the action is "intrinsic to the Commission's regulation of utility rates," we accord "a high level of deference, examining the logic of the inferences made and the correctness of legal propositions without replacing our own judgment for that of the Commission." Northern Ind. Public Serv., 907 N.E.2d at 1018.

13

Carbon Dioxide Emissions

Interveners requested modification of the CPCNs to include a requirement for mitigation of carbon emissions. On appeal, Interveners claim that the Commission acted contrary to law when it "fail[ed] to make any findings of fact or conclusions of law, whatsoever, regarding mitigation of carbon dioxide emissions." Appellants' Brief at 80. According to Interveners, the Commission accepted the Settling Parties' "ostrich approach" to global climate change and the role of carbon emissions, leaving ratepayers at financial risk in the future. Appellants' Brief at 81.

In the prior appeal, this Court addressed the Interveners' contention that the Commission could not ascertain the true costs of the Edwardsport facility without estimating future remediation costs:

> The next issue is whether the Commission adequately considered all known costs and estimates of future costs of the Edwardsport IGCC facility. Appellants argue that the Commission failed to consider future carbon regulations, the "extreme uncertainty of those costs," and the "absence of a cost estimate for carbon capture and storage." Appellants' Brief at 27. According to Appellants, future carbon regulation will require additional investment in the Edwardsport IGCC facility and the carbon compliance costs should have been considered in determining whether IGCC was the preferred option.
>
> Extensive evidence was presented to the Commission by Duke, Appellants, and other interveners regarding possible future carbon regulations, carbon capture abilities of the proposed Edwardsport IGCC facility, possible future costs related to the carbon regulations, and options other than IGCC that were considered by Duke. Numerous findings and conclusions by the Commission address the carbon issues. … In particular, the Commission noted:
>
>> With respect to our consideration of issues regarding the forecast of CO2 emission allowance prices we find that Duke Energy Indiana effectively utilized various scenarios that analyzed the impact of

14

possible future carbon regulation. While there was almost uniform agreement in this proceeding that $CO_2$ emissions will be regulated in the future, these emissions are not regulated today. Therefore, the Commission cannot assume or reasonably speculate in this proceeding regarding what, if any action, the U.S. Congress may ultimately take with respect to carbon regulation. Therefore, we find that [Duke's] analysis of potential future $CO_2$ emission allowance prices is reasonable as it strikes an appropriate balance with respect to alternative scenarios that may be applicable to the future regulation of carbon emissions.

[Appellants' App.] at 50. The Commission recognized that uncertainties exist regarding carbon capture and sequestration and ordered Duke to "continue its efforts to prepare for a future in which carbon is regulated." Id. at 67, 83.

Appellants do not challenge any particular finding or conclusion. Rather, Appellants focus on speculation concerning future carbon regulations and on a broad policy assessment that the Edwardsport IGCC facility should be delayed until future carbon regulations are known. Appellants' argument is merely a request that we substitute our judgment for that of the Commission.

The Commission recognized that Duke had considered several options in providing electricity in the future for its customers and that Duke "reasonably concluded that the IGCC project will be a more reliable supply resource than wind for addressing baseload capacity need." Id. at 42. Such complex evidentiary issues and policy determinations are better decided by an agency with technical expertise than this court. See PSI Energy, Inc. v. Ind. Office of Util. Consumer Counsel, 764 N.E.2d 769, 773 (Ind. Ct. App. 2002) ("Basic findings of fact are important because they enlighten the reviewing court as to the agency's 'reasoning process and subtle policy judgments' and allow for 'a rational and informed basis for review,' which lessens the likelihood that a reviewing court would substitute its 'judgment on complex evidentiary issues and policy determinations' better decided by an agency with technical expertise."), reh'g denied, trans. denied. The Commission's findings and conclusions on this issue are not clearly erroneous.

Citizens Action Coalition, 894 N.E.2d at 1065-66. Having failed to delay the IGCC Project by asserting the need to ascertain carbon emissions costs, Interveners renewed their generalized expressions of concern about the risk of future costs to ratepayers. However,

their argument is not confined to costs or the impact upon ratemaking. To the extent that Interveners suggest the Commission should issue a specific order to reduce carbon emissions, they do not identify the authority by which the Commission – which is not an environmental regulatory agency – could do so. Amici[10] simply ask that we revisit the issue of "actual project cost" and urge that we order the development of a carbon emission mitigation plan. Earthjustice Brief at 23. They contend that there is a growing consensus that utilities must address climate change.

> Douglas Esamann, President of Duke, testified in relevant part:
>
> [W]e are mindful of the additional costs that would be required to implement CCS [carbon capture and sequestration] at this time. Given that there are no current regulations or legislation requiring CCS at Edwardsport, there is no carbon tax, and there is no mandated participation in a carbon emissions allowance market, there is no reason to move forward with CCS implementation at this time. In addition, by deferring any potential implementation plans, we can preserve the ability to incorporate any advancements in technology that may occur in the future (if some form of $CO_2$ mitigation becomes required by regulation or legislation), which would benefit customers. The evidence of record shows that the Project is well-positioned to deal with $CO_2$ regulations that might be required in the future … The necessary space to install carbon capture is available, we have completed a preliminary study concerning carbon capture on the Project, and we have a plan pending for the study of various storage options, including enhanced oil recovery or carbon sequestration[.]

(Tr. 34,797-98.)

Interveners readily admit that, at this time, no federal law mandates that the Commission order carbon mitigation at the Edwardsport facility. Too, they point to no

---

[10] This group is comprised of Citizens Coal Council, Earth Charter Indiana, Healthy Dubois County, Inc., the Hoosier Environmental Council, Hoosier Interfaith Power & Light, Indiana Distributed Energy Alliance, and the Indiana State Conference of the National Association for the Advancement of Colored People.

Indiana statute requiring that an electric utility include carbon emissions costs in its resource planning analysis or otherwise evaluate risks associated with future carbon regulation.[11] Moreover, as we have previously acknowledged, the Commission is the agency with the requisite technical expertise in the area of ratemaking and its customary components. The potential economic effect of evolving emissions mitigation regulations is a factor for consideration if the Commission chooses, but there is no statutory mandate.

We are not persuaded that the Commission was derelict in its statutory duties when it declined to revisit the issue of potential future costs of carbon emissions at the Edwardsport plant. Nor can the settlement be considered contrary to law because it does not incorporate anticipated changes in the law. To the extent that Interveners or Amici believe that an immediate change in the law is appropriate, such concerns are more properly directed to the legislative branch of government.

### Ethical Considerations

Interveners unsuccessfully sought to open an additional subdocket. On appeal, they argue that the Commission had a duty to independently investigate, and hear evidence upon, pre-settlement improprieties. Interveners suggest that a proper inquiry by the Commission would have resulted in severe sanctions and presumably rejection of the Modified Settlement Agreement.

---

[11] The OUCC had once advocated that Duke perform studies on carbon capture and sequestration at the IGCC project. However, "further carbon sequestration analysis revealed that the Edwardsport site itself was not conducive to carbon storage and that the carbon would need to be transported approximately 50 miles, thus adding significant costs." (Tr. 35,079.) In the opinion of Barbara Smith, Director of the Resource Planning and Communication Division of the OUCC, ratepayers should not be expected to assume such costs.

17

Until September of 2010, Scott Storms ("Storms"), the Commission's Chief Administrative Law Judge, was the administrative law judge assigned to Duke's IGCC Project proceedings. David Lott Hardy ("Hardy") was the Chairman of the Commission.

On September 27, 2010, Storms accepted employment with Duke. On October 5, 2010, Governor Mitch Daniels fired Hardy for allowing Storms to remain as the administrative law judge on proceedings involving Duke at the same time Storms was negotiating for a position with Duke. See Duke Energy Indiana, Inc. v. Office of Utility Consumer Counselor, 983 N.E.2d 160, 165 (Ind. Ct. App. 2012). On November 9, 2010, Duke terminated Storms' employment, and the employment of Michael Reed, then president of Duke Energy Indiana and a former Executive Director of the Commission. Jim Turner, then vice president of Duke's parent company, resigned due to inappropriate emails between himself and Hardy.[12]

The Inspector General and the State Ethics Commission investigated the allegations of ethics violations regarding Storms and Hardy. The State Ethics Commission ultimately found that Storms had violated state ethics law, banned him from state employment, and assessed a penalty against him in the amount of $12,120. Final Order of Ind. State Ethics Comm'n, Case No. 2010-09-0233 (May 12, 2011), aff'd, Storms v. Ind. State Ethics Comm'n, Marion County Superior Court, Cause No. 49D03-1106-PL-022823 (Jan. 25,

---

[12] Duke executives had meetings and exchanged e-mails with Hardy, some of which discussed the Edwardsport project.

2012). Felony charges were lodged against Hardy and dismissed. The State appealed the dismissal, and the appeal is pending.[13]

The Commission conducted an audit of each ruling by Storms in each Duke case over which he presided. The Commission concluded that there were no anomalies in any IGCC proceeding dating back to 2006.

The Interveners fault the Commission for refusing to allow the introduction of evidence of the above-referenced ethical considerations in the IGCC Project rider proceedings. Interveners implicitly argue that Hardy's and Storms' involvement in proceedings while Storms sought employment with Duke ultimately impacted upon costs allocated to ratepayers in the approved settlement.[14]

Despite substantiation of improprieties prior to submission of the first settlement, Hardy and Storms had no involvement in the 2012 Modified Agreed Settlement. As we have

---

[13] Appellate Cause No. 49A02-1309-CR-756.

Also, on February 3, 2014, the Indiana Supreme Court Disciplinary Commission issued a public reprimand of Storms for a violation of Indiana Professional Conduct Rule 1.11(d), which provides that a lawyer currently serving as a public officer or employee shall not negotiate for private employment with a person involved as a party in a matter in which the lawyer is participating personally and substantially.

[14] Indiana Code section 4-2-6-9(a), regarding conflict of economic interest, provides:
A state officer, an employee, or a special state appointee may not participate in any decision or vote if the state officer, employee, or special state appointee has knowledge that any of the following has a financial interest in the outcome of the matter:

   (1) The state officer, employee, or special state appointee.

   (2) A member of the immediate family of the state officer, employee, or special state appointee.

   (3) A business organization in which the state officer, employee, or special state appointee is serving as an officer, a director, a trustee, a partner, or an employee.

   (4) Any person or organization with whom the state officer, employee, or special state appointee is negotiating or has an arrangement concerning prospective employment.

However, Interveners do not provide authority for the proposition that disallowance of costs of the IGCC Project or cancellation of the Project are appropriate remedies for an ethical violation by a State employee.

already observed, the 2010 settlement was withdrawn when allegations of improprieties surfaced. A second settlement was negotiated – without input from either Hardy or Storms – and that agreed settlement formed the basis for the Modified Agreed Settlement that determined what costs were to be borne by ratepayers. After submission of the second settlement agreement, four days of hearings were conducted; these hearings were conducted nearly two years after Storms' departure.

The Interveners have succinctly described the relief they seek as an order that the Commission "conduct further proceedings required to replace those [tainted] decisions." Interveners' Reply Brief at 21. However, further proceedings were conducted after the ethics scandal erupted. An internal audit was completed. Negotiations were resumed, and several days of contested proceedings were conducted by the Commission. Ultimately, these efforts resulted in the Modified Agreed Settlement approved by the Commission. Interveners challenge this approval by characterizing the settlement as tainted, in an effort to set aside the same. In short, Interveners seek nullification of the Modified Agreed Settlement without establishing that the approval was contrary to law.

In addition to the internal audit, the allegations of ethical violations and criminal conduct were dealt with by other entities having responsibilities for such.[15] The Commission did not shirk its statutorily-conferred duty to the ratepayers by refusing the submission of

---

[15] See Ghosh v. Ind. State Ethics Comm'n., 930 N.E.2d 23, 28 (Ind. 2010) (recognizing that jurisdiction lies with the Indiana State Ethics Commission to rule on termination of state employees for ethics violations).

evidence relevant to collateral proceedings but irrelevant to the settlement challenged on appeal.[16]

Reports from Black & Veatch

Interveners contend that they were entitled to be provided with monthly reports from engineering firm Black & Veatch and that ultimately, the Commission's reliance upon reports not shared with Interveners denied Interveners due process rights to a neutral fact-finder and to cross-examine witnesses and inspect documents relied upon by the Commission in reaching its determination of reasonableness.

Indiana Code section 8-1-1-5(a) provides:

> The commission shall in all controversial proceedings heard by it be an impartial fact-finding body and shall make its orders in such cases upon the facts impartially found by it. The commission shall in no such proceeding, during the hearing, act in the role either of a proponent or opponent on any issue to be decided by it. All evidence given in any such proceeding shall be offered on behalf of the respective parties to, or appearing in, the proceeding and not in the name or behalf of the commission itself.

Accordingly, "[t]he Commission cannot act in the role either of a proponent or opponent on any issue to be decided by it." Duke Energy, 983 N.E.2d at 164. Moreover, in a rate proceeding, the Commission is not to act upon its own independent information, "but

---

[16] We observe that the Commission decision, following an audit, to reopen proceedings in another Duke matter over which Storms presided, see Duke Energy 983 N.E.2d at 160, does not obligate the Commission to do so in each instance. There, the Commission had noted that the particular case "was the only proceeding during 2010 in which an appeal to the Court of Appeals was pursued by one of the parties." Id. at 167. Updated evidence was presented and the case was re-examined on its merits. Duke, on appeal, claimed that the Commission had acted arbitrarily and capriciously by looking twice at "materially the same evidentiary record" and reaching different decisions "without giving any reason for the change." Id. at 169. This Court affirmed the order on appeal. Id. at 172. Here, by contrast, there was a new submission in the form of a new settlement agreement. This second settlement agreement was not a product of Storms' prior service as an administrative law judge and was independently reviewed.

21

must base its findings upon evidence presented in the case, in which opportunity has been given to cross-examine witnesses, to inspect documents or exhibits, and to offer evidence in explanation or rebuttal, and nothing which has not been introduced as evidence can be treated as evidence." Public Serv. Commission of Ind. v. Indiana Bell Telephone Co., 130 N.E.2d 467, 235 Ind. 1 (1955). Thus, Interveners correctly claim that they are to be accorded an opportunity to challenge evidence offered by a party in controversial proceedings before the Commission.

However, Interveners' claim of deprivation is premised upon the assumption that the Commission relied upon the Black & Veatch reports as evidence pertinent to the Commission's task of ascertaining whether the proffered settlement was reasonable and in the public interest. The assumption is not well-founded. The record indicates that Black & Veatch was contracted to provide Project oversight "that falls outside the parameters [of the] IGCC[1] Rider proceedings." (Commission App. at 2.) (emphasis added). This June 3, 2008 order appointing the engineering firm for the purpose of providing construction oversight and status reports was not appealed. Additionally, Interveners point to no portion of the orders now on appeal that indicate the Commission made a finding of fact or conclusion based upon information provided by Black & Veatch.

In short, Black & Veatch reports were not offered by a respective party in controversial proceedings regarding the Modified Agreed Settlement, nor is there any indication that the Commission in any way considered these reports in contravention of its statutory duties.

Attorney's Fees

The Modified Agreed Settlement provided for the payment by Duke of substantial attorney's fees.[17] Interveners moved to dismiss the settlement on grounds of insufficiency of the evidence as to reasonableness of the fees. They now complain of the absence of a break-down of hourly rates and hours expended, and suggest that an absence of scrutiny by the Commission could foster a risk of collusion and ultimately, a detrimental effect upon ratepayers.[18]

In general, when a settlement under consideration by the Commission includes attorney's fees, the Commission will review the agreement for attorney's fees under a reasonableness standard. Citizens Action Coalition, 664 N.E.2d at 406. Here, however, the Commission observed that the fees were not payable by ratepayers, there was no evidence of bad faith in negotiations, and no credible evidence suggested that the settlement value was compromised by the obligation to be borne by the shareholders:

> The sums provided for in provision 9 of the Settlement Agreement are to be paid by Duke from shareholders' funds, and therefore represent financial commitments to be borne solely by the Company, separate and apart from the rate and regulatory provisions in the Settlement Agreement. The Non-Settling Parties object to this term of the Settlement Agreement and argue that it is not supported by the record evidence in this proceeding. The Non-Settling Parties did not provide any evidence that the Settlement Agreement negotiations were conducted in bad faith or were corrupted in any way by Duke's shareholders' payment of attorney fees and costs. Furthermore, as we noted above, the

---

[17] $11.7 million in attorney's fees and $600,000 in expenses was payable to counsel for the Duke Energy Indiana Industrial Group; between $800,000 and one million was payable as attorney's fees and expenses for Nucor's counsel; finally, the OUCC was to be paid $300,000 in expenses.

[18] Interveners point to class actions as an example where fee agreements are reviewed to prevent situations in which counsel settles the merits at an unreasonably low figure in order to obtain an unreasonably high fee payment. According to Interveners, particular scrutiny of attorney's fees should be mandatory where there is any potential for temptation.

23

outcome of the Settlement Agreement is within the reasonable range of the Settling Parties pre-settlement litigation positions. Accordingly, we do not find credible evidence to suggest that the value of the Settlement Agreement as discussed above has been compromised by the shareholder payments included in this term. The Settling Parties agreed to this term, but it does not require Commission approval.

(App. 243.) Interveners have not demonstrated that ratepayers were directly or adversely impacted by Duke's agreement to pay attorney's fees acceptable to Duke, such that the Commission had the obligation or authority to require itemization.

### Settlement Amount

Finally, Interveners attack the Modified Agreed Settlement's division of costs between ratepayers and shareholders. They claim that ratepayers ultimately bear the costs of imprudence by Duke, that the computation of AFUDC failed to account for an "interest-free loan from customers" in the form of deferred utility taxes, and that the Commission "simply accepted" a final figure because the Settling Parties had agreed to it. Appellants' Brief at 86, 88. The Interveners do not specifically assert that the settlement was so deficient that its acceptance by the Commission was arbitrary or capricious. See PSI Energy, Inc., 764 N.E.2d at 773 (recognizing that an arbitrary or capricious decision of the Commission may be set aside on appeal). Rather, they appear to argue that a more perfect division of costs could have been achieved.

In contested proceedings prior to the settlement, several of the parties had argued that Duke should not be able to shift costs of a huge increase in material quantities directly onto the ratepayers. The Commission had concluded:

24

> The evidence of record in this proceeding does not support that Duke fulfilled its responsibility to hold its primary contractors accountable through the terms of its contract with them or the management of such terms.

(App. 234.)

At the settlement hearing, Michael Gorman testified on behalf of the Duke Indiana Industrial Group (a group having facilities served by Duke). In his estimation, the agreement provided that Duke would bear "almost 88% of the construction cost increase" while only 12% would be collected from ratepayers. (Tr. 34,832.) He opined that, without settlement, there was "substantial litigation [and] regulatory risk, and the uncertainty for each party to this proceeding was material." (Tr. 34,831.) He acknowledged having previously recommended that the Commission enforce the original $1.985 billion estimate due to alleged "concealment" by Duke but was persuaded that the settlement "represents an acceptable resolution to the highly complex technical issues and litigation risk present in this case." (Tr. 34,830-31.) Ultimately, he predicted a rate reduction of $1.7 billion.

The OUCC (the statutory representative of the ratepayers) addressed the impact of the settlement upon the consumer, presenting testimony from Barbara Smith ("Smith"), the Director of the OUCC Resource Planning and Communication Division. Smith related the settlement terms and anticipated financial benefit to customers, including ratepayer annual savings related to prospective reflection of deferred taxes in Duke's capital structure ($22 million), depreciation adjustments on non-IGCC property over three years ($35 million), and accelerated depreciation on pollution control equipment ($32 million), funding of a collaborative (OUCC and Duke) development of a clean energy initiative, $3.5 million Duke

25

contribution to the Indiana Low Income Home Energy Assistance Program, and a potential income stream to ratepayers from a 100% share of the applicable retail jurisdictional net byproduct or co-product revenue from the IGCC Project. (Tr. at 35,066-67.)

Smith acknowledged that the Commission had found some of the construction costs imprudent, and that the Settling Parties "did not come to a common conclusion regarding concealment, fraud, and/or mismanagement." (Tr. 35,077.) However, Smith explained: "to the extent such activities occurred, the Settling Parties do agree that the transfer of $700 million in costs from ratepayers onto Duke shareholders is sufficient exculpation." (Tr. 35,077.) She stated that "non-Duke parties identified a number of items and costs incurred throughout the life of the Project that they contended were unreasonable" but opined that the settlement was a reasonable "resolution." (Tr. 35,075.) According to Smith, after "very tedious and time-consuming work," the hard-cap resolution represented a "shareholder hit" that was "reasonable and in the public interest." (Tr. 35,075.) In addition to the shifting of $700 million of costs, imposing the hard cap meant that other project cost overruns would be shifted to shareholders.[19] Smith testified that, absent the settlement, the shareholders "could bear up to $800 million in construction and financing costs that might have been recovered from Duke's ratepayers." (Tr. 35,077.)

Indeed, the record indicates that imprudence increased some construction costs. However, this reality was not ignored by the settlement terms. The Commission's order

---

[19] OUCC witness Wes Blakley, a Senior Utility Analyst, testified that the $700,000,000 reduction in IGCC construction investment results in a reduced revenue requirement saving ratepayers $1.5 to $2 billion over a thirty-year period.

26

addressed the propriety of the rate mitigation, the temporary retail rate moratorium, and the provision for graduated rate increases:

> Duke agreed to a number of measures that will mitigate the rate increases for its customers due to the IGCC project, including: (1) a rider restart methodology that will result in graduated rate increases, (2) lower depreciation rates on the remainder of the [sic] Duke's Indiana system (excluding qualified pollution control projects discussed below), (3) termination of the deferred tax incentive previously authorized for the IGCC Project, (4) a rate case moratorium, and (5) use of normal, straight-line depreciation for clean coal technology qualified pollution control projects that currently are being depreciated on an accelerated basis (which will be implemented for ratemaking purposes with the Company's next retail rate case order).

(App. 240.) We agree with Duke that it should not be required to "litigate with particularity the prudence of each and every expenditure" resulting in "protracted litigation the Settlement is designed to avoid." Duke's Brief at 60. Ultimately, the Commission found – within its expertise – that the multiple concessions by Duke resulted in a reasonable and publicly beneficial agreement notwithstanding the earlier conclusion that Duke had failed to prudently manage some contractors.

Interveners challenge the approval of the portion of the settlement specifying allowable AFUDC (or financing costs incurred during construction), claiming that it unreasonably fails to account for Duke's free use of funds when it collected taxes from ratepayers and then deferred payments to taxing authorities.[20] More specifically, Interveners observe that deferred taxes were taken into account in calculating financing costs

---

[20] During the hearings, Interveners had contended that the treatment of deferred taxes was intended to be a "reward for cost containment" and – dissatisfied with a prospective relinquishment of the incentive – had requested a refund of deferred taxes already collected. (Tr. 34,795.)

recoverable, monthly, in the form of CWIP (return on construction work in progress)[21] but "ignored the impact of this interest-free loan from customers in calculating Duke's rate of return for capitalized financing costs, AFUDC." Interveners' Brief at 86. Then, according to Interveners, "The Commission provided no justification for this disparate treatment of these two types of financing costs." Interveners' Brief at 86.

Duke, in turn, claims that the agreed treatment of AFUDC was in accordance with the Commission's rules and that the Commission's rules incorporate federal rate-setting regulations. More specifically, Duke directs our attention to 18 C.F.R. Part 101, Electric Plant Instruction No. 3(a)(17) (part of the Uniform System of Accounting promulgated by the Federal Energy Regulatory Commission, reciting a formula and elements for the computation of AFUDC that does not specify inclusion of deferred taxes).

According to Duke, the exclusion of deferred tax balances from the calculation of a utility's AFUDC is both historical and consistent with the federal uniform accounting principles.[22] Duke asserts that customers benefit from including the utility's deferred tax

[21] In light of allegations that Duke received a windfall in which the ratepayers did not share, Wes Blakley addressed the question "Does the Agreement discuss the inclusion of zero cost deferred income taxes in the capital structure" as follows:

Yes. [Duke] has agreed on a prospective basis to include zero cost deferred taxes in the capital structure, which effectively reduces the weighted cost of capital. Exclusion of zero cost capital from the capital structure had been granted in the original CPCN order in Cause No. 43114 as a form of incentive to [Duke] and was capped at $1.985 billion of IGCC investment. The actual impact that the exclusion of deferred income taxes has on the capital structure varies with the weighting of deferred income taxes as well as the weighting of other elements in the capital structure. The incentive provided about a 100 basis point increase in the weighted cost of capital. This increase in the weighted cost of capital, when applied to the amount of IGCC investment eligible for the incentive, equates to about $22 million of additional revenue requirement on an annual basis. By removing this incentive, ratepayers would immediately benefit from the reduced weighted average rate of return in the initial amount of approximately $22 million annually. (Tr. 35,224.)

[22] In response to questioning on the difference in a rate of return for CWIP and the rate of return for AFUDC,

28

balance in base rate calculation and its inclusion in the calculation of AFUDC would create potential for double recovery. Also, Duke observes that projects under construction do not generate deferred taxes prior to being placed in service.[23]

Danny Wiles, Director of Regulated Accounting for Duke, testified that, in general, Duke "will follow normal accounting guidance for determining whether a specific cost item should be capitalized to the IGCC construction project, expensed as an operating and maintenance expense item, or capitalized as an ongoing plant addition" and further testified that the Settlement Agreement was not inconsistent with normal accounting rules. (Tr. 35,302.) Too, Kent Freeman testified "the deferred tax incentive does not impact the rate of return calculation or the AFUDC rates[.]" (Tr. 34,693.)

On appeal, Interveners fail to support their bald assertion of improper calculation with identification of relevant testimony or generally accepted accounting principles in support of their position. We cannot, based upon Intervener's simple assertion, conclude that a necessary component was excluded that resulted in an improper calculation. We are not permitted to conduct a trial de novo. Citizens Action Coalition v. N. Ind. Pub. Serv. Co., 804 N.E.2d 289, 294 (Ind. Ct. App. 2004). Moreover, we are mindful that the Commission has particular expertise in the area of ratemaking and is not obligated to enter a particular finding

Duke Energy Business Services rate strategist Kent Freeman testified: "Traditionally, there always has been. AFUDC has, to my knowledge, not included the deferred taxes or any – for any of our projects, so that is – we're kind of going back to traditional retail ratemaking, which is the deferred taxes in the cap structure for the rate of return calculation, but we've not changed how we've done AFUDC for as far back as I'm aware." (Tr. 34,713-14.)

[23] Kent Freeman explained: "But AFUDC is applied during a construction period, so at that point, there's no deferred taxes – at least this is my understanding – so there's really no deferred taxes that are a rate base reduction at that point in time." (Tr. 34,712.)

on each aspect of evidence introduced. See Nextel West, 831 N.E.2d at 156-57 (recognizing that there is no requirement for substantiation of each component where the ultimate conclusion of public interest is adequately supported by findings).

Finally, Interveners take issue with the Commission's stated acceptance of a sum "fall[ing] within the proposed ranges that could be supported by the evidentiary record[.]" (App. 241.) Specifically, they articulate this issue as: "Did the Commission act contrary to law by approving a settlement allowing Duke to recover $2.595 billion – plus most of Duke's capitalized financing costs incurred after July 1, 2012 – through retail rates for the Edwardsport Project simply because this amount fell 'within the range of the evidence' presented, but without making any finding that this amount was actually the correct amount to charge ratepayers?" Brief of Appellants at 3.

At first blush, Interveners appear to urge reweighing of the evidence to come to a modified settlement figure more favorable to ratepayers than the approved "$94 million in direct construction costs above the previously approved amount of $2.225 billion."[24] (App. 241.) However, while they baldly assert that the Commission summarily adopted a sum without due consideration, they do not – indeed, cannot – offer authority for the proposition that the limited appellate review of agency decisions should incorporate a line-item accounting review. A Commission decision is not to be set aside because "we, as judges, might reach a contrary opinion on the same evidence." No. Indiana Public Serv. Co. v. OUCC, 826 N.E.2d 112, 118 (Ind. Ct. App. 2005).

---

[24] The Commission also observed that Duke was required "to shoulder at least $700 million in costs." (App. 241.)

The Commission, acting within its particular area of expertise, is to reach a well-reasoned decision supported by factual findings which find a basis in substantial evidence. The Commission complied with its statutory duty in this regard. See Davies-Martin Cnty. Rural Telephone Corp. v. PSC, 174 N.E.2d 63, 68 (Ind. Ct. App. 1961) ("If there is substantial evidence to support the findings, and if the determination, decision and order is one which the Commission has the power to make, in view of the findings, courts must uphold it.")

## Conclusion

Interveners have not demonstrated that the Commission acted contrary to law by approving the Modified Agreed Settlement.

Affirmed.

FRIEDLANDER, J., and KIRSCH, J., concur.